## National Life & Accident Insurance Company v. Kendall.

## Dixie Atlas Republic Insurance Company v. Same.

(Decided April 28, 1933.)

DELOZIER MOXLEY for appellants.

PERCY SHUMATE for appellee.

OPINION OF THE COURT BY DRURY, COMMISSIONER— Reversing.

Mrs. Emma Kendall, plaintiff, recovered a judgment against the National Life & Accident Insurance Company (hereinafter called the National Company) for $1,000 and aaginst the Dixie Atlas Republic Insurance Company (hereinafter called the Dixie Company) for $2,000, and these companies have appealed. These cases were heard together in the trial court, were considered together in this court, and will be disposed of in one opinion.

Mrs. Kendall was the beneficiary named in two policies of insurance issued by these companies upon the life of her son William Tyler Kendall, whereby, in substance, each agreed to pay Mrs. Emma Kendall the sums named above in the event of the insured's death resulting within ninety days, directly and independently of all other causes from bodily injury, etc., effected directly through external, violent, and· purely accidental means, and not caused by or contributed to directly or

indirectly, or wholly or partially, by any disease or mental infirmity contracted either before or after the injury.

William Tyler Kendall died of cerebrospinal men-.ingitis on February 8, 1931, and Mrs. Kendall sought to connect that ailment with an accident alleged to have befallen young Kendall on January 25, 1931. She had that burden to sustain; that is, she had to prove her son had received an injury through external, violent, and purely accidental means, and that his death was directly and entirely due to that injury, independently of all other causes.

## The Facts.

William Tyler Kendall was born March 29, 1910, and died February 8, 1931. That previous to his last illness he had been a robust healthy boy, and had not needed the services of a physician since 1918, when he was treated for a light attack of influenza. The young man is supposed to have received an injury to his head on Sunday January 25, 1931, to have suffered from headache all that week but continued to work, took to his bed on the evening of January 31st, grew rapidly worse, was attended by Dr. Walker, and was first visited by Dr. Baxter on February 5th and again when he was taken to a hospital in Louisville on February 6th, and he died there on February 8th.

Dr. A. A. Baxter testified he saw this boy on two successive days. This was probably on February 5th and 6th; certainly not later, for the young man was taken to Louisville on the 6th and died there on the 8th. The doctor testified he found a wound on the head of young Kendall at the juncture of the frontal and temporal bones, a deep lacerated wound with the bone exposed to an extent on the side of the head; it was a dented in wound, a severe one, probably half an inch square. By another witness it was described as a three-cornered dented in place, and by yet another witness, as a moon-shaped wound that would have been an inch long if it had been straight. This wound was eleven days old when Dr. Baxter saw it, and he says the bone was exposed, but does not make it clear whether it was then exposed or had been so. A sister of the young man, who is a practical nurse and was nursing him, says she saw the wound just before they took the young man to the hospital, February 6th, that it was then

healing nicely, and, when asked if you could see in and see the skull, answered, ''Oh, no.'' Still another witness and the only one who says which side of the head the wound was on (the left side) said the wound seemed to be healing. Probably the doctor had meant to say that, when the wound was fresh, the skull had been exposed. The doctor testified, ''It was not a fracture of the skull, but probably a fracture of the frontinel, at the suture of the bones.'' He testified that cerebrospinal meningitis is caused by a germ, the meningococcus, which by some means obtains access to and attacks the meninges, which is the covering of the brain and spinal cord.

All the doctors agree that the usual avenues by which the meningococcus germ reaches the meninges are the throat, the nose, and through the sinuses of the skull in the ethmoid region to the meninges. The plaintiff's problem is to find some proof to connect this injury with the access of these meningococcus germs to the brain of this young man.

Dr. Baxter testified that he could not say there was a fracture of the skull, but that he found none. He said that, but for the cerebrospinal meningitis, the young man would not have died from the injury he had. Dr. Baxter seemed to have two theories as to how this might have happened, as shown by this from his evidence:

First. ''Q. Was the injury which this boy had upon his head and shoulders—would that be sufficient to cause spinal meningitis to develop? A. It might be or might not be, according to the amount of inflammation that might take place from the wound.

''Q. In this particular case, was there inflammation set up in the wound in the injury to the skull? A. Yes, sir, in the inside as well.''

Second. ''Q. Tell the jury just how spinal meningitis develops from an injury. A. When one is injured, the streptococci goes to work. That is the inflammation that heals the wound or aids in healing the wound. Of course, it keeps the wound open and sore, and you have to use an antiseptic or it goes beyond control, and they get blood poisoning, erysipelas. This does its work. The other

germ comes in for spinal meningitis; it kills this germ—in fact, it eats it up, destroys it, takes hold itself. From that, it penetrates to the covering of the brain— not only the brain, but the spinal cord as well.

"Q. Did this young man have spinal meningitis which would indicate that it developed from a wound, or did he have the epidemic form of spinal meningitis? A. Well, the symptoms we found, you know, were of that severe pain in the head and the nervous condition. Of course, that condition, pain in the head, had existed since the injury, in the beginning, and it was natural for us to take those two together, the pain from the injury and the general nervous condition with the spinal meningitis—connect them together as one thing." Dr. Bogges in his evidence said:

"A. Recognizing the fact that such a condition as you outline, if true, and if this boy had an injury to the meninges from his fall and a slight meningeal hemorrhage sufficient to produce haziness for sometime after the accident, a rather persistent headache, I could conscientiously say there is a possibility that it would be, or might be a predisposing cause to the condition of which he died."

"Q. In case there was not any other cases in the neighborhood, or the county, at the time that this cerebral spinal meningitis developed would you say then doctor that it was caused by an injury lowering his resistance? A. I would say that under those conditions the possible chances of the trauma being a factor are increased. That is true.

"Q. In other words, if there is no other cases from which this young man might have contracted the disease it is highly probable that the disease would develop from the germ already in his body, is that correct? A. Yes, sir."

This is taken from the evidence of Dr. Allen:

"Q. Was there anything in your association in the case to indicate that the cerebral spinal meningitis came from an injury? A. No.

"Q. It is possible though that it did? A. It is possible that it resulted from it, yes, sir.

"Q. Now, is it probable that it resulted from an injury? A. Yes, sir."

772

This is taken from another part of Dr. Baxter's evidence:

"Q. Where it is the epidemic form, then, it goes through the throat and nose and sinuses into the brain—does it not? A. Yes sir, in the epidemic form.

"Q. You don't know, definitely, whether this was the epidemic form or not? A. Well, it could not possibly be in epidemic form or members of the family would have taken the disease. There was nothing done to try to prevent it. We thought it was not necessary to do anything to prevent it. It was not an epidemic."

Further in his evidence Dr. Baxter admitted he was not a bacteriologist, and that a case of cerebrospinal meningitis might develop and no one could tell whence it came; that the disease is produced by a specific germ, the meningococcus; that it is a germ disease; that it has to start somewhere, and may start regardless of an injury.

Dr. Bogges, a diagnostician, who was the first doctor to see this young man after he was taken to Louisville, said he was wildly delirious; was in a condition of almost continuous opisthotonos, a rigid muscular spasm in which the body is bent backwards; that the boy was in the last stages of cerebrospinal meningitis. This is taken from his testimony:

"Q. Could his death have occurred from any injury that he received exclusive of meningitis? A. You mean the death that I saw him in?

"Q. Yes? A. No.

"Q. Were there any indications from your examination at any time which indicated that this disease was caused by or even partially produced by trauma? A. No.

"Q. Or injury?

"A. No, injury will not produce this. You have to have your germ in the system.

"Q. To be specific, doctor, which is the probable result or cause and which is the possible cause of the two? A. Well, I will answer that and say that the probable cause is that the accident had little to do with the development, little, if anything,

to do with the development of the disease. The proper answer would be that there is a remote possibility that the trauma might have been a predisposing factor.

"Q. Could the trauma have caused that disease if the meningococcus germ had not been there previous to the trauma. A. It could not."

Dr. J. D. Allen, a pathologist, next saw this young man; he made a spinal puncture, and an examination of the fluid obtained showed this young man died of meningococcus meningitis, and this is taken from his testimony:

"Q. Is there any way of telling doctor, whether the condition from which this man was suffering was produced by an injury or by this germ being in his system? A. Before you can have meningitis the meningococcus germ must be in the system somewhere regardless of injury or anything else. The injury does not bring the bacteria there. The bacteria must be in your system somewhere before you can have that type of meningitis.

"Q. Now, if there had been no bacteria of that nature in the system of this patient could the injury that he had, or is said to have had, have produced it? A. No.

"Q. Would you have been able from the pathological examination that you made to tell which form of bacteria it was that produced this? A. Yes, sir.

"Q. Could you tell what form produced it in this case? A. Yes, sir.

"Q. And what form did? A. The meningococcus.

"Q. Is there any way of tracing that to an injury? A. No.

"Q. Is there any possible—any way of telling whether this came from an injury or came from some other source? A. No, cases of meningococcus meningitis are quite frequent; in other words, it does not have to occur during an epidemic.

"Q. If a person has the meningococcus germs in his system and he received an injury which would injure the meninges would you say that that

would cause the germs to take hold and show symptoms of meningitis? A. It could do it.

"Q. Does it do it very frequently or seldom? A. I would say seldom, insofar as the meningococcus is concerned.

"Q. But it is a possibility though it could? A. There is a possibility that it could.

"Q. Would you say that an injury that was sufficient to cause severe headaches and pains in the head would be an injury which would cause— which would lower the resistance to the extent that it would cause such a germ to take hold? A. Yes, sir.

"Q. If a person should receive such an injury as the one stated in the previous question and his body contained the meningococcus germs would they take advantage of this weakened condition and develop the disease? A. Now, I will answer that by saying that it is possible.

"Q. You did take a spinal puncture and ascertain what this young man had, did you not? A. Yes, sir.

"Q. Was there any streptococci in that puncture which you took? A. No, sir; they were meningococci.

"Q. Is it a fact that streptococci are eaten up and destroyed by the meningococci, or might they exist together? A. They might exist together.

"Q. Does either one destroy the other? A. Not necessarily so.

"Q. In a case of cerebrospinal meningitis, does either one come first, and then the other one come along and destroy it? A. No, sir.

"Q. Can you tell whether that temperature was the result of injury or was the result of the meningococci? A. Only by making a spinal puncture at that time and examining the spinal fluid.

"Q. And when you made the spinal puncture, what did you find? A. When we did make it, we found meningococci.

"Q. What did that indicate? A. It indicated a meningococci meningitis."

Dr. R. Glenn Spurling, a neurological physician who specializes in surgery of the nervous system, and who also made an examination of the spinal fluid taken by Dr. Allen, in his testimony said:

"In this particular case it was due to what we call the meningococcus germ, which is an organism or bacteria that causes the epidemic type of meningitis.

"Q. Was this what you would call a disease or was it the result of an injury—trauma? A. At the time I saw the man it was certainly a disease as stated above.

"Q. Could you tell whether it came—or where it came from? A. So far as I know there is no way of telling with absolute surety where a disease of this type comes from. It is usually supposed to be infectious in nature and transmitted from one individual to another or transmitted by the air or food or what not, from some unknown source.

"Q. The type that this young man had what would you call it? A. This was the epidemic type of meningitis.

"Q. Is there any other type that is referred to as a traumatic type? A. Oh, yes, there are many types of meningitis, some of which are usually seen after trauma. Others are usually seen after disease around the ear or nose or throat.

"Q. Now, is this the kind that is usually seen after trauma or from other causes? A. That is the type that is usually not seen after trauma. It usually appears as I say spontaneously from direct infection. In my experience I have never known of a meningococci meningitis to be directly traceable to a trauma lesion of the head. Theoretically it is possible. Practically I have never seen it and personally I think it is rather unlikely to have a pure meningococcic meningitis due to traumatic lesion of the head. We do not know where the first case of epidemic meningitis starts any more than we know where the first case of measles starts, or why it starts. There has to be a first case in every type of infection.

"Q. Does either one of those bacteria, the streptococcus or the meningococcus appear and

subsequently be destroyed by the other? A. I do not know of any situations where there is concomitant infection between the meningococcus and the streptococcus.

"Q. Would the two ever appear together? A. Presumably they could appear together. In other words, you could have a mixed type of meningitis. I have never seen one.

Q. Did this boy have a mixed type? A. No, sir.

"Q. Is it possible that this boy first had the streptococcus, and that the streptococcus was destroyed by the meningococcus, and that the meningococcus killed him? A. I have never heard of such a thing.

"Q. Does the meningococcus eat up the streptococcus, as a chicken eats up corn? A. I am not aware of any situation like that at all. I have never heard of that before.

"Q. Do the books give you any information to that effect? A. Not that I have ever heard of or ever read.

"Q. To what extent have you read on that subject? A. My experience with meningitis has been very extensive.

"Q. Has your reading on the subject been extensive or otherwise? A. I have not only read on it, but I have written on it rather extensively.

"The case under discussion is a meningococci meningitis. There is no question but that was the only organism that was affecting the meningeal spaces, because we have sufficiently accurate bacteriological data for that. Now, to say that there is a streptococcus infection somewhere else—in the nose or in this wound on his head or what not, I don't think that has a thing in the world to do with it at all. I see no connection.

"Q. There is one other question I would like to ask; suppose that the streptococcus germs took effect first, would it be possible that the strepococci meningitis afterwards changed to meningococci meningitis, by the fact that he also has meningococci germs in his body? A. I would say that

is a perfectly preposterious situation. I cannot conceive, under any circumstances, of that occurring.''

Dr. Walker did not testify. In the proof of death furnished to the National Company, Dr. Baxter gives spinal meningitis as the immediate cause of death and the fall from the horse as the remote cause, and Mrs. Kendall does the same. Those statements, however, would be of minor importance if not in harmony with the fully deevloped facts, but the facts as fully developed lead to the same conclusion. To enable Mrs. Kendall to recover, facts would have to appear that would connect this accident with the young man's death.

That the wound on the left side of his head alone and of itself would not have killed this young man is not disputed. Then the question arises, Does the proof show that the wound produced the spinal meningitis? and to that the answer is ''No.'' The evidence shows conclusively that the death of this young man was due to the meningococcus germ gaining access to the meninges, or the covering of his brain and spinal cord, and fails to show this access was the result of the accident. The meninges are entirely inclosed in and protected by the bones of the vertebral column and those forming the cranial vault. There is no proof the cranial wall or skull was fractured at the point of the blow the young man received in this accident. Not only is there a failure to show a fracture of the skull at that point, but the failure of the spinal fluid to show the presence of the streptococcus germs would seem to indicate there was no fracture at that point, for, had there been, the evidence indicates that the streptococcus germs would have availed themselves of that entrance at least as readily if not more so than the meningococcus germs. There is no evidence from which it can be inferred that the meningococcus germs can gain access to the meninges through the general system, the lymphatics, the blood stream, or otherwise than through some opening in the vertebral column or the cranial wall. Following as closely as it did after the occurrence of this accident, there comes a supposition that the disease is in some way a result of the accident, but a supposition is not enough; a judgment cannot be rested on a supposition. See Louisville & N. R. Co. v. Mann's Adm'r, 227 Ky. 399, 13 S. W. (2d) 257; Cochran's Adm'rs v. C. & O.

Ry. Co., 232 Ky. 107, 22 S. W. (2d) 452; Park Circuit & Realty Co. v. Ringo's Gd'n, 242 Ky. 255, 46 S. W. (2d) 106, 60 C. J. p. 1174, and 31 C. J. p. 1181, note 20, where the difference between a supposition and an inference is pointed out.

The proof shows young Kendall died from disease, not from accident, and we have looked in vain for evidence that the accident caused the disease. From the testimony of Dr. Bogges, we learn that the meningococcus is usually supposed to gain access to the meninges through the ethmoid region. From the testimony of Dr. Spurling, we learn that it is possible for persons apparently healthy to harbor these germs in their noses and throats for years. The evidence seems to indicate that they are harmless while in the nose or throat. The meninges appears to be their particular pabulum, and, when once they reach it, trouble is at hand. The ethmoid is one of the bones that form the cranial vault. It forms the anterior portion of the base of the skull. The name "ethmoid" is derived from a Greek word meaning a sieve or strainer. It is a very thin bone, almost as thin as paper in places, and a portion of it above the nose and approximately between the eyes (called the cribriform plate—from the Latin word Cribrum, meaning a sifter) is not only very thin, but is pierced and further weakened by a number of foramen for the passage of the nerves of smell and other purposes. This bone is frequently fractured by blows on the head, and we looked for such evidence in this case but found it not, nor did we find any evidence the accident was followed by any bleeding from the nose, mouth or ears; hence we are unable to say there is here any evidence that this accident set in motion a train of events that caused this young man's death. Children playing around a pile of bricks will frequently amuse themselves by standing in a line a number of bricks on end a few inches apart and then push the brick at one end of the line so that when it falls against brick No. 2, it will knock it and cause it to fall against No. 3, and cause it in turn to fall against and knock over No. 4, etc., so that, if 40 bricks have been set up, all of them will be knocked down. The child when it pushes over the first brick just as effectually causes the fall of the fortieth brick and is just as much the proximate cause of its fall as if the child had actually put his hand upon it and pushed it over. Just so, an acci-

dent may set in motion a train of events that leads to death, but, in order to recover under an accident policy, the claimant must show a connected train of causes and effects that lead directly to the death. Under the contracts sued on, these insurance companies did not undertake to insure against death by disease, and we are unable to distinguish this case from North American Accident Ins. Co. v. West, 245 Ky. 316, 53 S. W. (2d) 692, and the cases cited in that opinion.

Counsel cited us to no case directly in point, and we have been able to find but one, Hammons v. Edwards, 6 La. App. 752. That Louisiana case is much like the one before us. In that case the victim worked for four days complaining of headaches after the injury before taking to his bed. In our case this period was six days. In that case the victim died twelve days after the accident; in our case fourteen days. In that case the wound received by the victim was apparently upon the same place on his head as in our case, except it was the opposite side of the head. From the opinion it appears that the connection between the wound and the spinal meningitis was more clearly established in that case than in this case, yet the court reversed the judgment, and in ordering a new trial said:

> "The evidence indicates, however, that further evidence can be offered showing the connection between the wound and the disease or at least clarifying or explaining the testimony offered, and we think the cause should be remanded for further trial."

We feel very much as did the Louisiana court.

This, which is taken from page 159 of Vol. 21 2nd Ed., of the New International Encyclopedia will throw some light on this matter:

> "Fracture of the skull may take place either in the vault or at the base. In the vault the fracture is usually direct, the bone giving way at the point at which it was struck. * * * Fractures of the base * * * in most cases are indirect, i. e., the bones give way at a point remote from the seat of the blow."

The base of this boy's skull may have been broken by the blow on the side of his head.

The court erred in not directing. a verdict for the insurance companies. The judgment is reversed, with directions to grant the defendants a new trial; other questions being reserved.